**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KEITH R. SALEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:11-cv-00824** |
| **v.** | ) | **Judge Nixon** |
| | ) | **Magistrate Judge Knowles** |
| **CANEY FORK, LLC, d/b/a CANEY FORK** | ) | |
| **FISH CAMP d/b/a CANEY FORK RIVER** | ) | **JURY DEMAND** |
| **VALLEY GRILLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Pending before the Court is Defendant Caney Fork, LLC, d/b/a Caney Fork Fish Camp,

d/b/a Caney Fork River Valley Grille's Motion for Summary Judgment ("Motion") (Doc. No.

14), filed with a Memorandum in Support (Doc. No. 14-1), Statement of Undisputed Material

Facts (Doc. No. 14-2), several supporting documents (Doc. Nos. 14-3 to 14-13), and a

subsequently-filed Supplemental Memorandum (Doc. No. 20).  Plaintiff Keith R. Saley has filed

a Response in Opposition (Doc. No. 21), along with a Response to Defendant's Statement of

Undisputed Material Facts and a Statement of Additional Disputed Material Facts (Doc. No. 22),

and several supporting documents (Doc. Nos. 23, 24, & 25-1 to 25-9).  Defendant has filed a

Reply in support of its Motion (Doc. No. 26), along with a Response to Plaintiff's Statement of

Additional Material Facts (Doc. No. 27) and an Exhibit Witness Statement (Doc No. 28-1).

Plaintiff subsequently filed several Declarations of Authenticity (Doc. Nos. 29-1 to 29-4), to

which Defendant filed an Objection (Doc. No. 30).  For the reasons given herein, Defendant's

Motion is **DENIED**.

# I. BACKGROUND

*A. Factual History*[1]

Defendant operates restaurants in Nashville, Tennessee and in several other states. Plaintiff worked as general manager of Defendant's Nashville restaurant from January of 2005 to December 24, 2009. In December of 2009, the Nashville restaurant changed ownership. On November 13, 2009, Marc Barhonovich executed an agreement to assume a large share of the restaurant's assets and liabilities from Danny York, the original owner. On December 14, 2009, the United States Bankruptcy Court for the Middle District of Tennessee signed an order approving the sale of Defendant's ownership shares to Mr. Barhonovich.

Mr. Barhonovich began preparing to take over the restaurant sometime between late summer and November of 2009. In doing so, Mr. Barhonovich reviewed the restaurant's sales figures for 2009. Mr. Barhonovich liked the restaurant's location and determined that he could improve its profitability. He conducted meetings with key employees, including Wayne Harris, the Director of Operations for the restaurant. Working with Mr. Harris, Mr. Barhonovich developed plans to improve the restaurant by revamping the menu, drawing attention through more concerted marketing efforts, strengthening the reputation of the restaurant, increasing the professionalism of the staff, and upgrading the appearance and cleanliness of the restaurant.

Mr. Barhonovich also evaluated the staff as part of his company-wide review. Mr. Barhonovich wanted to discern if members of the staff would "step up" to meet the level of professionalism he desired. Mr. Harris conducted a survey of the employees to obtain their feedback regarding the positive and negative qualities of the restaurant. Mr. Harris also undertook an effort to observe the restaurant staff and solicit the advice of other managers to

---

[1] Facts in this section are undisputed and taken from Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 22) and Defendant's Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 27), unless otherwise noted.

determine whether any staffing changes were needed. For instance, he discussed the performance of certain employees with Plaintiff to decide whether to terminate or retain them. Mr. Harris discussed the performance of the management staff with Rick Hembroke[2], a manager who had been hired by Mr. York—the previous owner—to assist with overseeing all of Defendant's Nashville restaurants. After Mr. Barhonovich purchased the restaurant, Mr. Hembroke remained employed in some capacity, though the parties dispute the extent of his role. To Mr. Barhonovich, certain aspects of the restaurant which he viewed negatively—such as its sales record, reputation, cleanliness, and atmosphere among the staff—reflected poorly on Plaintiff, who, in Mr. Barhonovich's opinion, needed to "step up and start taking ownership of the restaurant."

Plaintiff reported to Summit Medical Center to undergo an outpatient medical test on the morning of December 15, 2009 and was released later that day. The test was performed on a Tuesday and Plaintiff returned to work on Thursday of the same week. Following the test, Plaintiff was ordered not to lift more than ten pounds for a period of three days and to refrain from drinking alcoholic beverages for a week. Mr. Harris and Mr. Hembroke were aware of Plaintiff's medical test because he requested two days off in advance of the procedure. Plaintiff did not speak to Mr. Barhonovich about the medical test.

When Plaintiff returned to work, he provided a note to Defendant, which contained information from his doctor explaining that he should lift no more than ten pounds for the next three days, and requested a modification of his responsibilities. During this three-day time period, Plaintiff's restriction was accommodated, with other employees performing lifting duties in his stead. After those three days, Plaintiff resumed all normal work activities.

---

[2] The parties used two different spellings—"Hembrook" and "Hembroke"—to refer to this individual in their filings. For the purposes of consistency in the present Order, the Court will use the spelling "Hembroke."

On the morning of December 24, 2009, Mr. Harris, accompanied by Mr. Hembroke, called Plaintiff into a back room at the restaurant. Mr. Harris said to Plaintiff, "this restaurant is going in different directions and right now, right now we're feeling that you're just not working out for us." Plaintiff then left the restaurant. Shortly after Plaintiff departed, Mr. Harris held a staff meeting with the employees working that day. He explained to the staff that Plaintiff had been terminated. Angelina Hearn, a server at the restaurant, testified that she was shocked at Plaintiff's termination. Certain employees present at the meeting have testified that, at the meeting, Mr. Harris said Plaintiff was terminated because of a health condition (and possibly for other reasons, though the parties dispute this particular fact). Mr. Harris and other employees present at the meeting, however, have testified that no statements were made concerning Plaintiff's health condition.

On February 17, 2010, Plaintiff filed a *pro se* Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant. On this form, Plaintiff checked the disability discrimination box, stated that he underwent medical examinations, noted that his employers inquired about his health, and declared his belief that he was terminated because management regarded him as disabled. Mr. Harris drafted Defendant's response to Plaintiff's EEOC charge ("Charge"). In it he stated that Plaintiff's "termination was recommended by his immediate supervisor, Rick Hembroke." He also stated that "Mr. Hembroke reported to the Director of Operations, Wayne Harris that Plaintiff had a drinking problem and he would disappear for long period [*sic*] of the day." Additionally, Defendant's response to the Charge alleges that Defendant terminated Plaintiff for failing to meet labor targets, change the management schedule, follow directions, maintain the restaurant's cleanliness, and meet sales expectations.

In his deposition testimony, Mr. Harris stated that he did not believe Plaintiff drank on the job because, after reviewing videotape footage from inside the restaurant, he did not discover any evidence to support this allegation. As to the "not following directions" allegation, which appears to be related to Plaintiff's alleged refusal to put up a banner outside of the restaurant, Mr. Harris admitted that Plaintiff "got the banners" but was apprehensive about putting them up because Defendant did not have the required approval from Nashville-Davidson County's Codes Department to do so. Mr. Harris also testified that he worked in the restaurant business his entire adult life and wrote notices of underperformance or insubordination for employees in the past, but never wrote a notice for Plaintiff before terminating him.

The EEOC conducted an investigation into Plaintiff's claims of discrimination. Following its investigation, the Commission issued a Determination finding cause to believe that Defendant violated the American with Disabilities Act as Amended (ADAAA). The EEOC stated that Defendant "provided no evidence to support its claim that [Plaintiff] was discharged because of performance issues and witnesses deny that [Plaintiff] had any performance issues."

*B. Procedural History*

Plaintiff initiated this lawsuit on August 29, 2011. (Doc. No. 1.) Plaintiff brings two claims against Defendant under the ADAAA, for disability discrimination and retaliation, and seeks back pay and benefits, front pay and benefits, compensatory damages, punitive damages, and reasonable fees and costs. (*Id.*)

Defendant filed the instant Motion on May 5, 2012 (Doc. No. 14), accompanied by a Memorandum in Support (Doc. No. 14-1), Statement of Undisputed Material Facts (Doc. No. 14-2), and several supporting documents (Doc. Nos. 14-3 to 14-13). On June 8, 2012, Defendant filed a Supplemental Memorandum. (Doc. No. 20.) On July 2, 2012, Plaintiff filed a Response

in Opposition (Doc. No. 21), along with a Response to Defendant's Statement of Undisputed Material Facts and Statement of Additional Disputed Material Facts (Doc. No. 22) and several supporting documents (Doc. Nos. 23, 24, & 25-1 to 25-9). On July 27, 2012, Defendant filed a Reply in support of its Motion (Doc. No. 26) and Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 27), along with an Exhibit Witness Statement (Doc No. 28-1). On August 2, 2012, Plaintiff filed several Declarations of Authenticity, all of which relate to several exhibits Plaintiff had previously filed with the Court (Doc. Nos. 29-1 to 29-4), to which Defendant filed an Objection on August 3, 2012 (Doc. No. 30).

## II. PRELIMINARY ISSUES

Before proceeding to the merits of Plaintiff's discrimination and retaliation claims, the Court must address two preliminary issues raised by Defendant. First, Defendant argues that the Court lacks subject matter jurisdiction over Plaintiff's ADAAA claims. Second, Defendant argues that several pieces of evidence cited by Plaintiff to establish genuine disputes of material fact are inadmissible, and should therefore be disregarded in the summary judgment analysis. The Court addresses these issues in the above order.

### A. Subject Matter Jurisdiction

Defendant first contends that the Court does not possess subject matter jurisdiction over the disability claim because Plaintiff did not specifically state the name or nature of the medical condition for which he was allegedly regarded as disabled. (Doc. No. 14-1 at 14; Doc. No. 14-13 at 7.) Similarly, Defendant argues that the Court does not possess subject matter jurisdiction over the retaliation claim because Plaintiff did not check the retaliation box or otherwise mention

his request for a reasonable accommodation in his EEOC Charge. (Doc. No. 14-1 at 24-25; Doc. No. 14-13 at 7.)

Federal courts do not possess subject matter jurisdiction over ADAAA claims "unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir. 2000) (citing *Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998)). Plaintiffs are not "excused from filing charges on a particular discrimination claim before suing in federal court." *Id.* (citing *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir.1998)). Thus, "[t]he claim must grow out of the investigation or the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt investigation of the claim." *Id.* (internal citation omitted). However, an EEOC charge must be construed liberally in favor of the plaintiff, particularly when proceeding *pro se* at the time of filing the charge, because federal courts recognize that "subsequent actions should not be restricted by the failure of a complainant to attach the correct legal conclusion to the EEOC claim, conform to procedural technicalities, or include the 'exact wording which might be required in a judicial pleading.'" *Davis*, 157 F.3d at 463 (quoting *EEOC v. Bailey Co., Inc.*, 563 F.2d 439, 447 (6th Cir. 1977)); *see also EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir. 1980).

Here, Plaintiff, undisputedly proceeding *pro se* (Doc. No. 27 at 8), checked the box for disability discrimination on his EEOC Charge, noted that he underwent several medical examinations about which management inquired, and stated his belief that he was terminated for being regarded as disabled (Doc. No. 14-13 at 7). Therefore, as to the disability claim, the Court possesses subject matter jurisdiction because Plaintiff explicitly stated his intent to pursue a disability claim in his charge. Additionally, the Court finds that requiring an EEOC claimant to

list his specific medical condition in the charge would be inconsistent with the broader purpose of the ADAAA, which is to protect employees from improper disability-related inquiries. *See* 42 U.S.C. § 12112 (d)(2)(A). In sum, the Court concludes that there is simply no requirement that a plaintiff must specifically describe his actual or perceived medical ailments in order for a district court to exercise subject matter jurisdiction over an ADAAA claim.

The Court also possesses subject matter jurisdiction over the retaliation claim. Defendant is correct that, under normal circumstances, "the failure to check the appropriate box on an EEOC charge will deprive a court of jurisdiction to hear a claim." *Duggins v. Stake N' Shake*, 195 F.3d 828, 832 (6th Cir. 1999). However, in this case, Plaintiff's retaliation claim would reasonably be expected to grow out of the disability claim because "retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to [the] defendants." *Id.* Plaintiff's disability and retaliation claims contain an "operative set of facts" from which an investigation into retaliation could reasonably be expected to grow. *See Tisdale v. Fed. Exp.*, 415 F.3d 516, 528 (6th Cir. 2005). The Charge states that Plaintiff underwent medical examinations and was terminated shortly after his managers asked about his medical condition. (Doc. No. 14-13 at 7.) Given that his three-day lifting restrictions were imposed as a direct consequence of the limitations resulting from his medical test, the retaliation and disability claims are inextricably linked. Moreover, the final EEOC determination, which found "reasonable cause to believe that Defendant violated the ADAAA," states that the Defendant denied that "medical restrictions played . . . [any] part in the decision to terminate [Plaintiff's] employment." (Doc. No. 14-13 at 9.) Thus, the EEOC *in fact* investigated the retaliation claim, and Defendant, by virtue of its denial *in fact* had notice of the existence of the claim. *See Davis*, 157 F.3d at 463 ("When the EEOC investigation of one charge *in fact* reveals

evidence of a different type of discrimination against the plaintiff, a lawsuit based on the newly understood claim will not be barred.") (emphasis in original). Therefore, the Court finds that it has subject matter jurisdiction over both Plaintiff's disability and retaliation claims.

### B. Evidentiary Issues

Second, Defendant contends that three pieces of evidence cited by Plaintiff to establish genuine disputes of material fact are inadmissible, and should therefore be disregarded in the summary judgment analysis. (Doc. No. 26 at 3-4, 12, 18.) In particular, Defendant objects to the admissibility of Mr. Hembroke's statements regarding the reasons for terminating Plaintiff, as recorded by an EEOC investigator (Doc. No. 25-4 at 42-43), Plaintiff's statements contained in his deposition recounting his hemochromatosis diagnosis (Doc. No. 25-1 at 140-45), and Plaintiff's single-page medical record describing his iron overload diagnosis (Doc. No. 25-8). The Court considers these arguments in the aforementioned order.

First, Defendant argues that Mr. Hembroke's statements to EEOC investigators are inadmissible hearsay.[3] (Doc. No. 26 at 12, 18.) In interview notes taken by an EEOC investigator and contained in the EEOC report, Mr. Hembroke states that the restaurant was "making money" in the time preceding Plaintiff's termination, Plaintiff displayed no performance issues, no drinking issues, ran the restaurant in a professional and efficient manner, and "was an excellent general manager." (Doc. No. 25-4 at 42-43.) Mr. Hembroke also advised the EEOC that "the company's reasons for terminating Plaintiff is [*sic*] false." (*Id.*) The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Therefore, witness statements incorporated into an investigative report may be considered on summary judgment "not to prove their truth . . . but to demonstrate the state of

---

[3] On August 2, 2012, Plaintiff submitted a declaration authenticating the EEOC investigation file. (Doc. No. 29-4.)

mind and motive of Defendant's managers in discharging Plaintiff." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (citing *Haughton v. Orchid Auto.*, 206 F. App'x 524, 532 (6th Cir. 2006)). As discussed *infra*, the parties dispute Mr. Hembroke's role in Defendant's business, and, in particular, the extent to which his input affected the decision to terminate Plaintiff. A jury could ultimately conclude that Mr. Hembroke did influence Defendant's decision to terminate Plaintiff. Accordingly, the Court finds that, for the purposes of the pending Motion, Mr. Hembroke's statements are admissible because a jury could reasonably find that they shed light on Defendant's state of mind. The statements, though, constitute admissible evidence only to the extent that they demonstrate the state of mind and motive of Defendant, and not to prove the truth of the matters asserted therein.

Turning to the second objection, Defendant argues that Plaintiff's own statements recounting his hemochromatosis diagnosis are inadmissible hearsay not subject to an exception. (Doc. No. 26 at 3.) Statements made by a patient "regarding medical opinions and diagnoses made by doctors who have examined a patient are not admissible." *Holt v. Olmsted Twp. Bd. of Trs.*, 43 F. Supp. 2d 812, 819 (N.D. Ohio 1998) (citing *Portis v. Grand Trunk W. R.R.*, No. 93-1721, 1994 WL 362110, at *5 (6th Cir. July 12, 1994)). Although a plaintiff may have personal knowledge of his diagnoses, the "diagnoses of . . . doctors may only be established through admission of the relevant doctor's records pursuant to Federal Rule of Evidence 803(6) or the sworn testimony of these doctors." *Id.* Therefore, the Court finds that Plaintiff's statements about the diagnoses of his doctors are hearsay and the Court will not consider them in connection with the pending Motion.

The Court notes, though, that Plaintiff's testimony concerning his physical condition and treatments is admissible pursuant to Federal Rule of Evidence 701, which allows lay opinion

testimony regarding one's physical state based on personal knowledge.  As the individual

personally suffering from his condition, "Plaintiff has personal knowledge of . . . [his] physical

condition and its symptoms."  *Id.* at 820.  As such, the Court finds that Plaintiff's testimony

regarding his physical condition and treatments falls under this exception to hearsay rule and is

admissible for purposes of the pending Motion.

As to the third evidentiary objection, Defendant correctly states that Plaintiff's single

page medical record is hearsay.  (Doc. No. 26 at 3-4.)  However, the Sixth Circuit has held that,

under Federal Rule of Evidence 803(6), "medical records can qualify for the business record

exception to the rule against hearsay."  *Norton v. Coyler*, 828 F.2d 384, 386-87 (6th Cir. 1987).

Therefore, the medical record describing Plaintiff's iron overload diagnosis and high iron levels

does not constitute inadmissible hearsay if:

> (A) the record was made at or near the time by—or from information transmitted
> by—someone with knowledge; (B) the record was kept in the course of a
> regularly conducted activity of a business, organization, occupation, or calling,
> whether or not for profit; (C) making the record was a regular practice of that
> activity; (D) all these conditions are shown by the testimony of the custodian or
> another qualified witness, or by a certification that complies
> with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) neither the source of information nor the method or circumstances of
> preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  The Court finds that the single-page medical record—accompanied by the

declarations filed by Plaintiff (Doc. Nos. 29-1 to 29-3)—satisfies these requirements and

therefore falls within the business record exception to the hearsay rule.

Defendant also argues that Plaintiff's medical record has not been authenticated.  (Doc.

No. 26 at 3.)  Federal Rule of Evidence 901 makes authentication a condition precedent to

admissibility.  In its Response, Plaintiff did not include an affidavit or declaration establishing

the authenticity of the document.  However, on August 2, 2012, Plaintiff filed several

declarations authenticating Plaintiff's medical record. (Doc. Nos. 29-1 to 29-3.) Despite Plaintiff's filing of the declarations, Defendant argues that the Court should deem the medical record unauthenticated because the declarations were not filed with Plaintiff's initial Response and are therefore untimely.[4] (Doc. No. 30 at 1.) In resolving this issue, the Court finds the approach in *Thomas v. Harvey*, 381 F. App'x 542, 546 (6th Cir. 2010)—which involved a similar evidentiary dispute during the summary judgment phase—particularly instructive. In *Thomas*, the defendant moved for summary judgment on discrimination claims, but relied heavily on several unauthenticated transcripts from an EEOC hearing. *Id.* at 545. The district court deemed the transcripts admissible for purposes of the motion, and made its order granting summary judgment conditional on the defendant's ability to properly authenticate the records within fourteen days of the order's entry. *Id.* On appeal, the Sixth Circuit upheld the district court's consideration of the transcripts, even though the transcripts were not authenticated until after the district court entered its conditional order. *Id.* at 546. Here, Plaintiff submitted evidence of authentication well *before* the Court's entry of this Order. Therefore, in the interest of fairly considering all of the evidence that Plaintiff contends supports his claims, the Court finds the declarations filed on August 2, 2012 sufficient for the purposes of authentication, and thus the medical record is admissible for purposes of the pending Motion.

## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

---

[4] To the extent that Defendant's Objection restates its substantive arguments regarding Plaintiff's disability (Doc. No. 30 at 1-2), the Court resolves those issues in its analysis of Defendant's Motion.

moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine dispute of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine dispute of material fact for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330-31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Id.* If the

court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

### B. Discrimination Claim

The Court now turns to the merits of the summary judgment motion. The ADAAA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADAAA, a plaintiff may establish disability discrimination by showing that: (1) he is disabled within the meaning of the statute; (2) he is otherwise qualified to perform the essential functions of the job he held or desired, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of a disability. *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001). Defendant argues that Plaintiff has failed to show a genuine dispute as to the disability and causation elements of his discrimination claim, but Defendant does not argue that Plaintiff has produced sufficient evidence showing genuine disputes of material fact regarding the essential-functions element of Plaintiff's claim. Therefore, the Court analyzes only the disability and causation elements of Plaintiff's discrimination claim.

### 1. Disability

"The term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). An individual is "regarded as having such an impairment" if "the individual establishes that he or she has been subjected to an action

prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). Whether an individual's impairment "substantially limits" a major life activity is "not relevant" to coverage under the "regarded as" prong. 29 C.F.R. § 1630.2(j)(2). Importantly, the regulations implementing the ADAAA, consistent with Congress's broad purpose to liberalize the ADA, broadly define "physical or mental impairment" as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, [or] endocrine." *Id.* § 1630.2(h)(1). Therefore, the relevant inquiry for establishing a disability under the third prong is an examination of whether Defendant regarded Plaintiff as possessing one of the listed impairments.

Defendant makes several arguments as to why Plaintiff has not produced sufficient evidence to create a genuine dispute of material fact as to whether Plaintiff qualified as disabled under the "regarded as" prong of the ADAAA. Defendant argues that Plaintiff could not have been regarded as disabled because Mr. Barhonovich terminated Plaintiff, and Mr. Barhonovich was totally ignorant of Plaintiff's impairment. (Doc. No. 14-1 at 21.) Defendant also contends that Plaintiff's only actual or perceived impairment was a liver biopsy. (*Id.* at 14.) Defendant further asserts that Plaintiff's impairment is merely conjectural or speculative because his condition is not symptomatic. (*Id.* at 15-16.) Finally, Defendant claims that the persons responsible for discharging Plaintiff lacked sufficient knowledge regarding Plaintiff's actual or perceived impairment to regard him as disabled. (*Id.* at 20-21.) In his Response, Plaintiff argues that the medical evidence and testimony concerning his medical condition shows that he

qualifies as disabled under the "regarded as" prong. (Doc. No. 21 at 12-16.) The Court considers these arguments in turn.

First, Defendant claims Plaintiff could not have been regarded as disabled because Mr. Barhonovich testified that he made the "ultimate decision" regarding Plaintiff's termination, and he had no knowledge of Plaintiff's impairment. (Doc. No. 14-4 at 45, 88-89.) Even accepting this assertion as fact, it has no bearing on Defendant's ability to regard Plaintiff as disabled. Mr. Barhonovich testified that his "decision to terminate . . . was based upon the input I received from Mr. Harris." (*Id.* at 121-22.) Under the "cat's paw" theory of liability, Defendant could still be liable if discriminatory intent influenced Mr. Harris's input to Mr. Barhonovich. *See Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.").

Second, Defendant claims that Plaintiff's only impairment was a liver biopsy, which Defendant asserts is not an impairment under the ADAAA. (Doc. No. 14-1 at 14.) Plaintiff has produced a medical record confirming his diagnosis of "iron overload" contained in the blood, also known as hemochromatosis. (Doc. No. 25-8 at 1.) The medical record establishes that Plaintiff's medical condition is a "disorder[] of iron metabolism," a life-threatening impairment which undoubtedly "affects one or more body systems, such as . . . [the] hemic[5] [system]." 29 C.F.R. § 1630.2(h)(1). Plaintiff has produced evidence showing that he intermittently undergoes phlebotomy treatments during which his blood is drained in order to lower his blood-iron levels. (Doc. No. 25-2 at 140; Doc. No. 25-8 at 1.) Plaintiff testified that he has received blood removal

---

[5] "Of, relating to, or produced by the blood or the circulation of the blood." *Hemic*, Merriam-Webster, http://www.merriam-webster.com/medical/hemic (last visited July 24, 2012).

treatments for over two years, and prior to his treatment in December of 2009, he was "tired and kind of rundown." (Doc. No. 25-2 at 140.) Therefore, drawing all reasonable inferences in favor of the non-moving party, the Court finds that Plaintiff has produced sufficient evidence to create a genuine dispute of material fact as to whether he suffers from an actual or perceived impairment affecting one or more systems as defined in 29 C.F.R. § 1630.2(h)(1).

Third, Defendant asserts that Plaintiff does not qualify as disabled because "high iron levels in the blood is [*sic*] not disabling for [Plaintiff] as it causes no symptoms." (Doc. No. 14-1 at 15.)[6] However, Defendant's argument is inconsistent with the logic of the "regarded as" prong of the ADAAA. Congress enacted the ADAAA with the specific intention to overturn the holding of *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), in which the Supreme Court ruled that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures. *See* 29 C.F.R. § 1630, App. (2011). Under current law, whether an individual's impairment "substantially limits" a major life activity is "not relevant" to coverage under the "regarded as" prong. 29 C.F.R. § 1630.2(j)(2). "[T]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." *Id.* § 1630.2(j)(1)(vi). Thus, Plaintiff may recover under the "regarded as" prong in the absence of visible symptoms, or any symptoms at all.

Fourth, Defendant contends that Plaintiff does not qualify as disabled because his perceived impairment is "transitory and minor." (Doc. No. 14-1 at 17.) Protection under the ADAAA's "regarded as" prong only extends to an "actual or perceived impairment that is not

---

[6] Defendant's characterization of the record with respect to Plaintiff's symptoms is not entirely accurate. Plaintiff produced evidence describing his symptoms prior to treatment, which includes the time period during which he worked for Defendant and was terminated. (*See* Doc. No. 25-2 at 140.) In any case, as discussed *infra*, the symptomatic expression of Plaintiff's condition is irrelevant to the disability inquiry.

both transitory and minor." 29 C.F.R. § 1630.2(e)(2)(iii). A transitory impairment is "defined as lasting or expected to last six months or less," *id.* § 1630.15(f), while a minor impairment includes "common ailments like the cold or flu," *id.* § 1630.2(l), App. (2011) (citing H.R. Rep. No. 110-730, pt. 2, at 18 (2008)). The relevant inquiry is whether the actual or perceived impairment is objectively "transitory and minor," not whether the employer subjectively believed the impairment to be transitory and minor. *Id.* "For example, an employer who terminates an employee whom it believes has bipolar disorder cannot take advantage of this exception by asserting that it believed the employee's impairment was transitory and minor, since bipolar disorder is not objectively transitory and minor." *Id.* The regulations further provide that:

> [a] covered entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor.

*Id.* § 1630.15(f).

Plaintiff has produced medical evidence stating that he actually suffers from iron overload, or hemochromatosis (Doc. No. 25-8), which the Court finds to be distinguishable from a minor ailment like the cold or flu. Hemochromatosis is an acute disease requiring regular phlebotomy treatments, for which Plaintiff has had to seek the care of hematologists. (Doc. No. 25-2 at 140-41, 142-43, 163, 233-34.) Additionally, Plaintiff has produced evidence showing that his impairment is not transitory. To combat hemochromatosis—an incurable, lifelong, and permanent ailment—Plaintiff has received phlebotomy treatments for more than two years (Doc. No. 25-2 at 140; Doc. No. 25-8), far longer than the six-month period required to be deemed not transitory, 29 C.F.R. § 1630.2(e)(2)(iii). Moreover, even if Plaintiff's *actual* impairment were transitory and minor, he has produced sufficient evidence showing a genuine dispute of material

fact as to whether his *perceived* impairment was transitory and minor. Plaintiff has produced the sworn testimony of other employees testifying that Mr. Harris said Plaintiff could "no longer . . . meet the physical requirements of the job or work the necessary hours due to his health problems." (Doc. No. 23 ¶ 4.) Therefore, drawing all reasonable inferences in favor the non-moving party, the Court finds that Plaintiff has shown a genuine dispute of material fact from which a reasonable juror could conclude that his impairment is not transitory and minor.

Defendant's repeated attempts to analogize *LaPier v. Prince George's County*, No. 10-CV-2851 AW, 2011 WL 4501372 (D. Md. Sept. 27, 2011), to the present case are unavailing. As an initial matter, in *LaPier*, with respect to the ADAAA claims, the court ruled on a motion to dismiss, not a motion for summary judgment. *Id.* at *1. Therefore, the court in *LaPier* evaluated only the plaintiff's complaint, not a developed factual record. As to substance, the court did not emphasize "the physical manifestation of the blood disorder as it was apparent to others and affected [the plaintiff's] ability to work," as Defendant would lead the Court to believe (Doc. No. 14-1 at 15). Rather, the court found that the plaintiff's complaint failed to allege that his actual impairment affected him for more than one week, and therefore only alleged a "transitory or minor" impairment with "an actual or expected duration of six months or less." *LaPier*, 2011 WL 4501372, at *5 (citing 42 U.S.C. § 12102(3)(A)). By contrast, Plaintiff has produced sufficient evidence, as discussed above, to create a genuine dispute of material fact regarding the permanence of his actual or perceived condition of hemochromatosis.

Finally, Defendant contends that it lacked sufficient knowledge regarding Plaintiff's actual or perceived impairment to regard him as disabled. (Doc. No. 14-1 at 20-21.) Defendant argues that, according to the deposition testimony of Mr. Harris, only Mr. Harris possessed any knowledge about Plaintiff's medical condition, and that this knowledge was very limited. (Doc.

No. 14-6 at 88-89.)  Mr. Harris testified that Plaintiff never informed him that he underwent a liver biopsy or discussed a diagnosis of elevated blood-iron levels with him.  (*Id.* at 137-45.) Additionally, Defendant argues, Mr. Harris could not have known about any doctor's visits preceding the biopsy because Plaintiff only scheduled them during his days off.  (Doc. No. 25-1 at 149.)  Furthermore, Defendant argues that the only written documentation Plaintiff provided to Defendant did not include specifics about Plaintiff's health condition.  (*Id.* at 177-78.)

Plaintiff points to specific evidence in the record to show that Defendant had knowledge of Plaintiff's actual or perceived disability.  (Doc. No. 21 at 13.)  Plaintiff testified that he informed Mr. Hembroke and Mr. Harris about his abnormal blood-iron levels and the potential for his condition to "do damage to the organs."  (Doc. No. 25-1 at 140-41, 158-59, 160, 164.) Plaintiff purportedly advised Mr. Harris and Mr. Hembroke that that "a normal person's [blood-iron] level is around 150, and they found me as high as 1,800, which is a big difference."  (*Id.* at 156.)  Plaintiff testified that he told both Mr. Hembroke and Mr. Harris that he was diagnosed with "iron overload" and that his body "cannot give up iron like a normal person."  (*Id.* at 172.) Additionally, Plaintiff testified that he discussed his liver biopsy with Mr. Harris (*id.* at 158-59, 164), along with the extent of his medical restrictions after the procedure (*id.* at 160).  Mr. Harris asked Plaintiff, "what's going on with your blood level and everything like that?"  (*Id.*)  After the liver biopsy, Plaintiff testified that he told Mr. Harris that he would need to "get some blood drained" every three or four weeks.  (*Id.* at 166.)  Plaintiff testified that Mr. Hembroke, on several occasions, asked if "he needs any time off or any special treatment."  (*Id.* at 169.)  Mr. Harris testified that Mr. Hembroke told him that Plaintiff "might not be able to do all of his job responsibilities when he comes back" from his "medical procedure."  (Doc. No. 25-3 at 138-39.)

Given this conflicting testimony about whether Defendant regarded Plaintiff as disabled, the Court finds that there is a genuine dispute of material fact as to whether the disability prong of the ADAAA is satisfied. Resolving whether Plaintiff was regarded as disabled would entail determinations of witness credibility, which is not the role of a judge on a motion for summary judgment. *Anderson*, 477 U.S. at 255. Accordingly, the Court finds that Defendant has failed to show that there is no genuine dispute of material fact as to whether Defendant regarded Plaintiff as having an actual or perceived impairment.

### 2. But-for Causation

To prevail on an ADAAA discrimination claim, a plaintiff must prove that he or she suffered an adverse employment action "because of" a disability. 42 U.S.C. § 12112(b)(1); *see also Henderson*, 247 F.3d at 649. Beginning with *Maddox v. University of Tennessee*, 62 F.3d 843, 846 (6th Cir. 1995), the Sixth Circuit interpreted "because of" to mean that a plaintiff must prove that his or her disability was the "sole reason" for the employer's adverse action. Recently, in *Lewis v. Humboldt Acquisition Corp.*, the Sixth Circuit overturned the "sole reason" causation standard and instead adopted a but-for causation standard. No. 09-6381, 2012 WL 1889389, at *313, *321 (6th Cir. May 25, 2012). Now, the relevant question is whether the employer would have taken the same adverse employment action even if the plaintiff were not disabled. *Id.*; *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owens, Prosser and Keeton on Law of Torts 265 (5th ed. 1984)) ("An act or omission is not regarded as a cause of an event if the particular event would have occurred without it."). If a plaintiff proves that his employer would not have terminated him in the absence his disability, the plaintiff establishes the causation element of his claim. Because the moving party must "show[] that there is no genuine dispute as to any material fact"

under Rule 56(a), an employer acting as the moving party must show that no reasonable juror could find that the employee would have been retained in the absence of his disability.

Defendant contends that, for several reasons, Plaintiff cannot establish a genuine dispute of material fact regarding causation because Plaintiff's termination would have transpired the same way, even in the absence of his disability.  (Doc. No. 26 at 10-12.)  First, Defendant argues that Mr. Barhonovich terminated Plaintiff because the restaurant needed fresh ideas to improve the business.  (Doc. No. 25-5 at 75-79.)  Similarly, Defendant argues that Mr. Barhonovich sought to replace Plaintiff because the restaurant was struggling financially, and he wanted to terminate employees responsible for the low profitability.  (*Id.* at 77-79.)  Furthermore, Defendant's vendors were operating only "cash on delivery" due to business illiquidity.  (Doc. No. 25-1 at 133-135; Doc. No. 25-3 at 74-75.)  Defendant also asserts that Plaintiff was terminated due to his generally poor performance as a manager.  Mr. Barhonovich testified that the subpar sales, atmosphere among the staff, cleanliness, and presentation of the restaurant reflected poorly on Plaintiff.  (Doc. No. 25-5 at 73, 77, 79.)  Defendant points to the testimony of Mr. Harris and Kahne Vaughn as supporting this assessment of Plaintiff's performance.  (Doc. No. 14-9 ¶¶ 7-9; Doc. No. 25-3 at 106-13.)

By contrast, Plaintiff has produced evidence of discussions with his employers about his medical condition and their questions about his medical condition, as discussed above.  Plaintiff has also produced the testimony of fellow employees stating that he was an excellent manager. (Doc. No. 23 ¶ 3; Doc. No. 24 ¶¶ 3, 5; Doc. No. 25-7 at 11.)  Mr. Hembroke's written testimony states that he believed Plaintiff was a good manager.  (Doc. No. 25-4 at 42-43.)  Additionally, Plaintiff has produced direct evidence of statements made by his employers to establish that disability discrimination played a role in the termination decision.  Specifically, Heidi Hanna, a

server and host for Defendant, testified that on the day Mr. Harris discharged Plaintiff, Mr.

Harris held a meeting with other employees and announced to them that "he had terminated

[Plaintiff's] employment because [Plaintiff] was no longer able to meet the physical

requirements of the job or work the necessary hours due to his health problems."  (Doc. No. 23

¶ 4.)  Angelina Hearn, a bartender for Defendant, testified that at the same meeting, Mr. Harris

"stated that [Plaintiff] was no longer able to do the job because of his health."  (Doc. No. 24 ¶ 4.)

Melissa Pyrtle, a server for Defendant, testified that Mr. Harris "said that [Plaintiff] was no

longer going to be with us, because his health was not good and he couldn't perform his duties to

their  - -  to the best of his abilities because he was in bad health."  (Doc. No. 25-7 at 17-18.)

Defendant claims that another portion of Ms. Hearn's Declaration actually supports its argument

that disability was not a but-for cause of discrimination because Mr. Harris mentioned "other

problems within the store," in addition to health, as the reasons for Plaintiff's termination.  (Doc.

No. 26 at 14 (citing Doc. No. 24 ¶ 4).)

Ultimately, evaluating this conflicting testimony to determine whether Plaintiff would

have still been terminated even in the absence of his disability requires credibility

determinations, the weighing of evidence, and the drawing of inferences.  On a motion for

summary judgment, these are "jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.

Therefore, the Court finds that there is a genuine dispute of material fact regarding but-for

causation.  Defendant's Motion is accordingly **DENIED** insofar as Defendant has moved for

summary judgment on Plaintiff's disability claim.

### C. Retaliation Claim

As an initial matter, Defendant argues that Plaintiff's retaliation claim is barred because

only plaintiffs proceeding under the first two disability prongs may pursue a retaliation claim,

whereas a plaintiff proceeding under the "regarded as" prong may not pursue such a claim.

(Doc. No. 14-1 at 22.)  Defendant asserts that the statutory definition of "reasonable

accommodation" mandates this outcome.  (*Id.*)  The relevant language from the regulations

implementing the ADAAA states:

> A covered entity is required, absent undue hardship, to provide a reasonable
> accommodation to an otherwise qualified individual who meets the definition of
> disability under the "actual disability" prong (paragraph (g)(1)(i) of this section),
> or "record of" prong (paragraph (g)(1)(ii) of this section), but is not required to
> provide a reasonable accommodation to an individual who meets the definition of
> disability solely under the "regarded as" prong (paragraph (g)(1)(iii) of this
> section).

29 C.F.R. § 1630.2(o)(4).  Defendant misinterprets § 1630.2(o)(4) because the Sixth Circuit has

held that "a plaintiff may prevail on a disability-retaliation claim 'even if the underlying claim of

disability fails.'"  *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) (quoting *Soileau v.

Guilford of Me. Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)); *see generally Baker v. Windsor Republic

Doors*, 414 F. App'x 764 (6th Cir. 2011) (upholding jury verdict finding retaliation while

reversing jury verdict finding that employee regarded as disabled was entitled to reasonable

accommodation).  Indeed, the appendix accompanying the regulations implementing the

ADAAA specifically states that "[c]laims of . . . retaliation may be brought by any applicant or

employee, not just individuals with disabilities."  29 C.F.R. § 1630, App. at n.1 (2011).

Therefore, § 1630.2(o)(4) does not raise a procedural bar against a retaliation claim brought by a

plaintiff proceeding under the "regarded as" prong.  Rather, § 1630.2(o)(4) plainly relieves

employers of the duty to provide reasonable accommodations to individuals only "regarded as"

disabled, but still leaves employers liable for terminating employees who are retaliated against

for making a good-faith request for a reasonable accommodation.  "An individual who is

adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim

under the ADA." *Baker*, 414 F. App'x at 776-77 & n.8 (6th Cir. 2011) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3rd Cir. 1997)).  Therefore, § 1630.2(o)(4) does not bar Plaintiff from bringing a retaliation claim while proceeding under the "regarded as" prong for his underlying disability claim.

The Court now turns to the merits of the retaliation claim.  There are two methods by which a plaintiff can prove retaliation: direct evidence or indirect evidence.[7]  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).  To establish a *prima facie* case of retaliation under the ADAAA burden-shifting framework using indirect evidence, a plaintiff must establish that: (1) he was engaged in a protected activity, (2) the exercise of his civil rights was known to the defendant, (3) the defendant subsequently took adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action—in this case, Plaintiff's termination.  *Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 588-89 (6th Cir. 1998).  Once the plaintiff has established a *prima facie* retaliation claim, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  *Bryson*, 498 F.3d at 561.  If the defendant does so, then the plaintiff must "show that the proffered reason was not its true reason but merely a pretext for retaliation" by demonstrating that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action.

---

[7]  While the *McDonnell-Douglas/Burdine* burden-shifting framework is appropriate in cases involving indirect evidence of discrimination, and the parties themselves have both applied the framework, in this case there also exists direct evidence of retaliation.  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999).  "Because direct evidence of the employer's discrimination exists, application of the *McDonnell Douglas* burden-shifting framework is inappropriate."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1179 (6th Cir. 1996) (citation omitted).  As already discussed above, Plaintiff has produced direct evidence of statements made by Defendant that, if believed, require the conclusion that unlawful discrimination was at least a factor in Defendant's termination decision.  Were a jury to find this testimony credible, it could, without drawing any inferences, determine that Plaintiff's discharge was motivated by retaliation.  Nevertheless, because the parties do not raise this issue, and because relying on this evidence is inappropriate at the summary judgment stage, the Court analyzes Plaintiff's retaliation claim under the circumstantial evidence framework.

*Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citation omitted).

### 1. Prima Facie Case

Defendant argues that Plaintiff fails to establish two elements of the *prima facie* retaliation claim: (1) that he was engaged in protected activity, and (2) a causal connection between the protected activity and the adverse employment action. (Doc. No. 14-1 at 22-24.) The Court considers these elements in turn.

Defendant contends that Plaintiff's request for a three-day lifting restriction, as directed by his treating physician, does not constitute a good-faith request because Plaintiff believed that his hemochromatosis was not disabling, but only temporary. (*Id.* at 22.) "The showing of a good-faith request for reasonable accommodations" is a "protected act" for purposes of an ADAAA retaliation claim. *Baker,* 414 F. App'x at 776-77 & n.8 (6th Cir. 2011). Given the evidence of Plaintiff's hemochromatosis diagnosis and liver biopsy (Doc. No. 25-2 at 140-41, 145, 175-77; Doc. No. 25-8), and his knowledge concerning its permanence and severity (Doc. No. 25-2 at 140-41, 142-43, 163, 233-34), the Court finds that a reasonable juror could conclude that Plaintiff had a reasonable, good-faith belief that he was entitled to the accommodation he requested.

Next, Defendant argues that Plaintiff has failed to establish a causal connection between his lifting restriction request and his termination. To establish a causal connection, a plaintiff must produce "sufficient evidence from which an inference could be drawn that the adverse

action would not have been taken" had the plaintiff not engaged in the protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "Temporal proximity between an assertion of . . . rights and a materially adverse action is sufficient to establish the causal connection element of a retaliation claim "[w]here an adverse employment action occurs *very close* in time after an employer learns of a protected activity." *Lindsay v. Yates*, 578 F.3d 407, 418-19 (6th Cir. 2009) (citations omitted). The Sixth Circuit has held that a twenty-one day lapse between protected activity and the adverse action falls well within the bounds of close temporal proximity. *See DiCarlo*, 358 F.3d at 421-22 (6th Cir. 2004). In this case, Plaintiff requested the three-day lifting restriction on December 17, 2009 and was terminated on December 24, 2009. (Doc. No. 14-6 at 89-90; Doc. No. 25-1 at 174-75.) The seven-day separation between Plaintiff's lifting restrictions and his termination is clearly sufficient to satisfy the causal connection element. Therefore, the Court finds that Plaintiff has established a *prima facie* case of retaliation.

### 2. Legitimate Reasons for Termination and Pretext

Relying on the testimony of Mr. Harris (Doc. No. 14-1 at 25-28; Doc. No. 26 at 15-17), Defendant presents evidence of several legitimate, non-discriminatory reasons for Plaintiff's adverse employment action, including: Plaintiff's disappearance for many hours during the workday (Doc. No. 14-3 at 225, 231); failure to meet "target" labor standards by refusing to make changes to the management schedule (*id.* at 109); general resistance to change, including opposition to a proposed New Year's Eve party and posting a banner outside the restaurant (*id.* at 106-13); and the cleanliness of the restaurant (*id.*). Additionally, Mr. Barhonovich testified that he was disappointed in the sales figures of the restaurant, which he believed reflected poorly on Plaintiff. (Doc. No. 14-4 at 79.)

Initially, the Court notes that, in this instance, Plaintiff need not discredit every legitimate reason proffered by Defendant. Defendant has not argued that each factor alone would have independently resulted in Plaintiff's termination. (*See* Doc. No. 26 at 15.) Therefore, Plaintiff "need not show that all of the factors . . . are false but rather, only that some of the factors are false and a mere pretext for discrimination." *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006).

Plaintiff points to particular evidence to establish that Defendant's justifications are inconsistent and have shifted over time. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996), *am. on other grounds*, 97 F.3d 833 (6th Cir. 1997). Plaintiff argues that a comparison of statements to EEOC investigators and statements after the commencement of this litigation reveals inconsistencies in Defendant's characterization of the role Mr. Hembroke played in Plaintiff's termination. In its response to the initial EEOC charge, Mr. Harris stated that Plaintiff's "termination was recommended by his immediate supervisor, Rick Hembroke." (Doc. No. 25-4 at 55.) In his statements to the EEOC, Mr. Hembroke characterized Plaintiff as "working for him." (*Id.* at 42.) Plaintiff corroborated this characterization by testifying that Mr. Harris informed him that Mr. Hembroke "was a direct supervisor over me" and that "when Wayne Harris wasn't here, Rick Hembroke was the one in charge." (Doc. No. 14-3 at 90.) Plaintiff testified that Mr. Hembroke was paid $250 per week "under the table" once Mr. Hembroke began drawing social security benefits, and that this practice continued after Mr. Barhonovich obtained ownership of the restaurant. (Doc. No. 25-3 at 88-90.)[8] Also in his statements to the EEOC, Mr. Hembroke claimed that "the company's

---

[8] In his deposition, Mr. Harris testified that he knew Mr. Hembroke was being paid cash under the table in December of 2009. (Doc. No. 25-3 at 73-74.)

reasons for terminating [Plaintiff] is [*sic*] false" and stated his belief that Plaintiff was a good manager without performance issues. (Doc. No. 25-4 at 42.)

In contrast to these initial statements to EEOC investigators and the testimony of Plaintiff and Mr. Hembroke, Mr. Harris testified in his deposition that the decision to terminate Plaintiff was "solely [made by] Wayne Harris." (Doc. No. 25-3 at 98-99.) Mr. Harris further testified that he "didn't know what [Mr. Hembroke's] role was." (*Id.* at 130.) Similarly, Mr. Barhonovich testified that he didn't know Mr. Hembroke's role in the restaurant, and, despite "hanging around the restaurant" and attending a meeting with managerial agents, he "wasn't part of my group of employees." (Doc. No. 25-5 at 45-49.) Moreover, Mr. Barhonovich testified that he, not Mr. Harris, "made the determination to get rid of [Plaintiff]." (*Id.* at 80.) In light of these inconsistencies regarding the reasons for Plaintiff's termination, a reasonable juror could conclude that, over time, Defendant attempted to distance itself from the statements Mr. Hembroke made to EEOC investigators regarding the reasons for Plaintiff's termination.

Drawing all inferences in favor of the non-moving party, the Court finds that a reasonable juror could conclude that Mr. Hembroke's opinion played a significant part in the decision to fire Plaintiff, and that Mr. Hembroke's testimony regarding Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff are pretextual. The inconsistency of these statements by different managers gives rise to important factual questions and demonstrates a genuine dispute of material fact regarding Defendant's proffered reasons for Plaintiff's termination. *See Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (finding that inconsistency of managerial testimony created a question of material fact rebutting the defendant's legitimate reasons for termination).

Additionally, Plaintiff argues that Defendant has abandoned—and then offered new theories for—Plaintiff's termination as this litigation has progressed. (Doc. No. 21 at 20-22.) In his response to the EEOC filing, Mr. Harris, before stating any other reasons for Plaintiff's discharge, asserted that he terminated Plaintiff because Mr. Hembroke informed him that Plaintiff "had a drinking problem and he would disappear for long period [*sic*] during the day." (Doc. No. 25-4 at 55.) However, Mr. Harris testified in his deposition that "[t]here was a suspicion, but I could not prove it. And I looked into it and looked at the videos, and there was no evidence of him drinking on the job." (Doc. No. 25-3 at 216.) A reasonable juror could infer that Defendant's justifications are pretextual because it relied on an allegation of drinking that lacks any factual basis. Also, inadequate restaurant cleanliness was not cited as a reason for Plaintiff's termination in Defendant's initial response to the EEOC. (*See* Doc. No. 25-4 at 54-55.) Later, however, both Mr. Harris and Mr. Barhonovich testified that insufficient cleanliness was a reason for termination. (Doc. 25-3 at 111; Doc. No. 25-5 at 48.) Similarly, lackluster sales figures were not cited as a legitimate reason in the EEOC investigation, but were later offered as a cause of termination by Mr. Barhonovich. (Doc. No. 25-5 at 81.) A reasonable juror could infer that these shifting reasons for termination connote pretext.

Plaintiff presents evidence to show that resistance to change is a pretextual reason for termination. (Doc. No. 21 at 7, 23.) Defendant does not dispute that Plaintiff's resistance to placing a large banner outside the restaurant was motivated by a desire to avoid violating Metro Government of Nashville and Davidson County, Tennessee Ordinance 6.04.010. (Doc. No. 25-3 at 107.) The ordinance prohibits:

> affix[ing] in any manner any sign, placard, poster, card, banner or other indicia of the interests of any person, group or organization on any post or pole, including, but not limited to, light and telephone poles, on any street, sidewalk, thoroughfare or public right-of-way within the jurisdiction of the metropolitan government.

Davidson Cnty., Tennessee, Municipal Code § 6.04.010 (2011). When Plaintiff objected to violating the ordinance, Mr. Harris said, "[i]f we get a ticket, we'll deal with that issue when it comes." (Doc. No. 25-3 at 108.) The Court finds that Plaintiff has produced sufficient evidence to rebut this proffered reason for termination because directing an employee to engage in unlawful activity does not constitute a legitimate reason for an adverse employment action.

Plaintiff also offers evidence to establish that several of Defendant's justifications have no basis in fact. (Doc. No. 21 at 23.) For instance, with respect to the contention that Plaintiff failed to meet labor targets, Mr. Harris testified that Defendant never quantified a labor target and that no target was communicated to Plaintiff. (Doc. No. 25-3 at 177-78.) Mr. Harris testified that "the target was not being missed because there was no target." (*Id.* at 219.) With respect to Plaintiff incorrectly scheduling managers' hours, Mr. Harris testified that he put Mr. Hembroke in charge of the schedules sometime around the first week of December 2009. (*Id.* at 224.) Accordingly, the Court finds that Plaintiff has presented sufficient evidence from which a reasonable juror could conclude that several of Defendant's justifications have no basis in fact.

Additionally, Plaintiff points to specific evidence in the record to establish that Defendant's legitimate reasons are pretextual due to its failure to terminate employees engaging in similar or worse alleged conduct. (Doc. No. 21 at 23-24.) A plaintiff can show pretext by proffering "evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). Defendant claims that Plaintiff was terminated for his failure to adequately maintain the cleanliness of the restaurant. (Doc. No. 26 at 15-16.) When Plaintiff managed the restaurant, the health inspector awarded scores of eight-five in January of 2009,

ninety-one in July of 2009, and ninety in February of 2009. (Doc. No. 25-4 at 41-46.) Plaintiff

presents evidence showing that when his replacement, Vicki Schela, managed the restaurant, the

health inspector awarded scores of forty-four in August of 2010, with a follow-up adjusted score

of seventy-seven, also in August of 2010.[9] (Doc. No. 24-4 at 48-54.) Nonetheless, in his

deposition Mr. Harris testified that Ms. Schela "performed real good [*sic*]" (Doc. No. 25-3 at

195), and Mr. Barhonovich testified that she "voluntarily resigned" to work at Cracker Barrel

(Doc. No. 25-5 at 61). From this evidence, the Court finds that a reasonable juror could infer

that cleanliness was a pretextual justification for termination because Plaintiff and his

replacement were treated differently for allegedly similar conduct.

Furthermore, Defendant's failure to locate Plaintiff's employment file is troublesome to

the Court, and weighs against the proffered reasons for termination. Mr. Harris testified, and

Defendant does not dispute, that Plaintiff's employment file has not been found. When speaking

to EEOC investigators, Mr. Harris stated that he didn't "even know if [Plaintiff] had a

[personnel] file." (Doc. No. 25-3 at 56.) Mr. Harris testified that, during the summer of 2009,

all personnel files in the Nashville restaurant were moved to one of Defendant's restaurants in

Santa Fe, New Mexico for record-keeping consolidation purposes. (Doc. No. 24-3 at 82-84.)

Defendants have been unable to find any of these stored personnel files. (*Id.* at 86-87.)

Subsequently, Mr. Harris testified that he began keeping a "temporary personnel" file in which

he collectively stored the records of all employees. (*Id.* at 179-80.) However, Mr. Harris

---

[9] In his deposition, Mr. Harris appeared to contradict his own testimony regarding the time during which Ms. Schela managed the restaurant: "I'm only aware of one health inspection when Vicki was there, and that was in January or February [of 2010]." (Doc. No. 25-3 at 111.) Later, during questioning from Plaintiff's counsel about the August 6, 2010 health inspection report, Mr. Harris testified that, "at that time, Vicki Sheila was not an employee either, I don't believe." (*Id.* at 199.) Drawing all legitimate inferences against Defendant, the Court, for purposes of this Motion, assumes Vicki Sheila was the manager at the time of the August 6, 2010 health report.

testified that, after Plaintiff's termination, he attempted to find the temporary file in the human resources office, but "it was not there." (*Id.* at 180-81.)

Keeping well-organized, secure, and complete employment files makes the resolution of retaliation and discrimination claims simpler and more efficient due to the availability of documentary evidence. Losing employment files is troubling because employees are not afforded the opportunity to use documentary evidence to discredit the legitimate, non-discriminatory explanations offered by employers. A reasonable juror could infer that the loss of Plaintiff's employment file around the time he filed an EEOC claim casts doubt on the veracity of Defendant's explanations for the termination. Indeed, Defendant has lost both Plaintiff's individual personnel file and the temporary, collective personnel file. Because the Court must draw all reasonable inferences against the moving party, the Court finds that Defendant's inability to locate both employment files adds weight to Plaintiff's arguments rebutting Defendant's legitimate, non-discriminatory reasons for his termination.

For the above reasons, the Court finds that Plaintiff has presented sufficient evidence to rebut Defendant's legitimate, non-discriminatory justifications for termination. Accordingly, Defendant's Motion is **DENIED** insofar as Defendant has moved for summary judgment on Plaintiff's disability claim.

### D. Punitive Damages

Lastly, Defendant has moved for summary judgment on the issue of punitive damages. An ADAAA claimant can recover punitive damages by "demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's

knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). An employer's conduct need not be "egregious" to satisfy the requirements for a punitive damages award.[10] *Id.* at 546. Rather, a plaintiff must only show that the employer "discriminate[d] in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536.

Plaintiff has offered evidence of Mr. Harris's experience in the human resources field to establish that Defendant likely knew it may have been acting in violation of federal law. Mr. Harris worked as vice-president of employee training for Captain D's (where he advised workers about topics such as employment law), served as director of human resources at Mr. York's Santa Fe restaurants (where he handled an EEOC claim in 2009), drafted an attempted release of claims for Plaintiff, represented Defendant before the EEOC, drafted the response to Plaintiff's Charge of Discrimination, and drafted an employee handbook and progressive discipline policy for Defendant. (Doc. No. 24-4 at 1-4, 17-18; Doc. No. 25-3 at 17-18, 20, 46-47, 93-94, 115-18, 121-24.) In denying that he told other employees that Plaintiff was being terminated due to his medical condition, Mr. Harris stated, "I know better as an HR professional, you don't talk about a person's health condition in front of other employees." (Doc. No. 25-3 at 158.) The Court finds that, from this evidence, a reasonable juror could conclude that Defendant acted with reckless disregard to the possibility of violating federal prohibitions against disability discrimination.

---

[10] Defendant's argument that punitive damages are unavailable because the case at bar does not involve the hallmark "egregious conduct" of punitive damages cases (Doc. No. 14-1 at 30) misses the mark. Egregious conduct is not required. Even under an "egregious conduct" standard, a jury question arguably exists as to whether Defendant committed such egregious conduct by terminating Plaintiff on Christmas Eve and allegedly announcing to a room full of employees that Plaintiff could not work due to health problems.

Moreover, Defendant argues that punitive damages are inappropriate in this case because the ADAAA, enacted on September 17, 2008, created an underlying theory of discrimination that is novel or otherwise poorly recognized. (Doc. No. 14-1 at 30.) However, the federal prohibition against discrimination and retaliation on the basis of disability is well-settled law and the "regarded as" prong existed before the 2008 amendments. It is true that the 2008 amendments expanded the scope of the "regarded as" prong, but the statute's terms are clear and were publicly available for over one year prior to Plaintiff's termination. One year is well within the period of time during which human resources departments can and should obtain knowledge about major legislative enactments. In any case, a more detailed inquiry into Defendant's state of mind and knowledge of the ADAAA can occur at trial. For the purposes of Defendant's Motion, however, Plaintiff has shown enough evidence to create a genuine dispute of material fact as to whether Defendant "discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 536. Accordingly, Defendant's Motion is **DENIED** insofar as Defendant has moved for summary judgment on Plaintiff's claim for punitive damages.

## IV. CONCLUSION

In light of the above analysis, Defendant's Motion is **DENIED**.

It is so ORDERED.

Entered this _____10th_____ day of August, 2012.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT